## Case No. 13,112.

### SMITH et al. v. SWORMSTEDT et al.

[5 McLean, 369.] [1]

Circuit Court, D. Ohio. Oct. Term, 1852. [2]

RELIGIOUS SOCIETIES — CHURCH DIVISION — BOOK CONCERN—BENEFICIARIES—LAPSED CHARITY.

1. The general conference of the Methodist Episcopal Church is a delegated or representative body, with limited constitutional powers; and possesses no authority, directly or indirectly, to divide the Church.

[See Bascom v. Lane, Case No. 1,089.]

2. In the adoption of the "Plan of Separation" in 1844, there was no claim to, or exercise of, such a power.

3. As the general conference is prohibited from any application of the produce of the Book Concern, except for a specified purpose, and in a specified manner; and as the annual conferences have refused to remove this prohibition, by changing or modifying the sixth restrictive rule, the general conference has no power to apportion or divide the concern, or its produce, except as provided for by said rule.

4. Said Book Concern is a charity, devoted expressly to the use and benefit of the traveling, supernumerary, and superannuated preachers of the Methodist Episcopal Church, their wives, widows, and children, continuing in it as an organized Church; and any individual, or

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Reversed in 16 How. (57 U. S.) 288.]

any number of individuals, withdrawing from, and ceasing to be members of the Church, as an organized body, cease to be beneficiaries of the charity.

5. It is the undoubted right of any individual preacher or member of said Church, or any number of preachers, or members; or any sectional portions or divisions thereof, to withdraw from it, at pleasure; but in withdrawing, they take with them none of the rights of property pertaining to them while in the Church; and, the withdrawal of the Southern and South-Western conferences in 1845, being voluntary, and not induced by any positive necessity, is within the principle here stated.

[Cited in Watson v. Garvin, 54 Mo. 370.]

6. The defendants, as trustees or agents of the Book Concern at Cincinnati, being corporators under a law of Ohio, and required, by such law, "to conduct the business of the Book Concern in conformity with the rules and regulations of the general conference," in withholding from the Church South, any part of the property or proceeds of said Book Concern, have been guilty of no breach of trust, or any improper use or application of the property or funds in their keeping.

7. This is not a case of a lapsed charity, justifying a court of equity in constructing a new scheme for its application and administration; and the complainants, and those they represent, have no such personal claim to, or interest in, the property and funds in controversy, as will authorize a decree in their favor, on the basis of individual right.

In equity.

H. Stanbery, Mr. Brien, and R. M. Corwine, for complainants.

Ewing, Lane & Riddle, for defendants.

LEAVITT, District Judge. This bill is prosecuted in the names of [William R.] Smith, Green, and Parsons, appointed as they aver, commissioners by the authority of the Methodist Episcopal Church South, and of John Kelly and James W. Allen, supernumerary preachers, and John Tevis, a superannuated preacher, all belonging to the traveling connection of said Church, and having, as they allege, in common with the whole body of preachers in such connection, a personal interest in all the property held by the Methodist Episcopal Church. They aver that they act by the authority of the general conference and the annual conferences of the Church South, and file their bill for the benefit and in behalf of said Church, and of themselves, and all other traveling preachers, and other persons interested in its funds and property. The defendants are Leroy Swormstedt and John H. Power, agents of the Book Concern at Cincinnati, and, as such, having, as averred in the bill, in law, the custody and control of the property and effects of said Book Concern, and James B. Finley, all being in the traveling connection of the Methodist Episcopal Church, and interested in its funds and property. After asserting the claim of the Church South to the property in question, growing out of the alleged division of the Methodist Episcopal Church, in 1845, the bill alleges that the said commissioners have made unavailing efforts to effect an amica-ble adjustment of the matters in controversy; and they now resort to this court, asking a decree for an account and an equitable apportionment and division of the property and effects set out in the bill. The property directly involved in this suit is the Methodist Book Concern at Cincinnati, consisting, as the bill alleges, of houses, lots, machinery, printing-presses, books, paper, debts, cash, and other effects, amounting to about the sum of two hundred thousand dollars. It may be well here to notice, that this Book Concern had its origin at an early period of the Methodist Episcopal Church, in this country. Its primary object seems not to have been, the founding of a charity for the future benefit of the traveling clergy, but to furnish, at a cheap rate, books and periodicals under the sanction and auspices of the Church, suited to the wants and improvement of the Methodist communion, in science, morals, and religion; thus serving as an auxiliary agency in the consummation of the great end, early avowed by that Church, of "spreading scriptural holiness through these lands." The pecuniary means by which it was enabled to commence its operations, were made up by the donations of preachers and other persons, who favored the laudable purpose of its institution. For a time, all the traveling preachers in the connection were required to contribute annually a fixed sum, in aid of its funds. Its first location was at Philadelphia, from whence, however, it was removed, in 1804, to the city of New York. Through the active efforts of the traveling ministry, who were required to act as agents for the sale of the books and publications of the Concern, they were extensively disseminated and sold. Its means and resources had become greatly increased, and the sphere of its usefulness was fast extending, when, in 1836, it was destroyed by fire. Soon after this calamitous event, as the result of active efforts made in its behalf, it was again placed on a basis of efficiency and prosperity by the liberal contributions, not only of those in the Church, but of others not belonging to the connection. In 1820, a branch of the Concern was established in Cincinnati, connected with and subordinate to the institution in New York. In 1839, by an act of the legislature of the state of Ohio, the branch at Cincinnati was incorporated, and the agents then in office, or who should subsequently be appointed by the general conference of the Methodist Episcopal Church, were created a body politic and corporate by the name of the "Methodist Book Concern;" and it was declared, by the act of incorporation, that the agents "shall hold their agency, and conduct the business of the Concern in conformity with the rules and regulations of the said general conference." Under the able and faithful administration of the agents intrusted with its management, this Book Concern has greatly prospered, and its capital

and resources have rapidly increased. Previous to the year 1796, the profits arising from the sales of books were applied exclusively to pious and charitable objects, but principally to the support of · traveling preachers and their families. The conference of that year determined that those profits should be applied wholly to the relief of traveling preachers, including such as were superannuated, and the widows and orphans of those who were deceased. From that period, this fund has been regarded as pledged to this charitable use; and by the sixth restrictive article of the constitution of 1808, which will be more fully noticed hereafter, it is placed out of the power of the general conference to divert this fund to any other purpose, except by "the concurrent recommendation of three-fourths of all the members of the several annual conferences, who shall be present and vote on such recommendation," and the approving vote of two-thirds of the succeeding general conference. It may be proper here to state that, by the discipline of the Church, the annual conferences are the distributers of this fund to those entitled to its benefit. They report to the general conference the names and number of persons who are entitled as beneficiaries to receive it, and the sum to be paid to each, and the amount is then apportioned to the several annual conferences, and paid to them for distribution. But this fund is only to be used to make up deficiencies in the amounts requisite for the support of its beneficiaries. All are not entitled, as a matter of course, to share its benefits; but such only as are deficient, from the failure of the quarterly and annual conferences to raise the requisite sums, by collections and contributions, for their support. Such, then, is briefly the origin, history, and purpose of this charity, and the principle on which, and the machinery by which, it is to be administered to its beneficiaries.

These remarks have prepared the way for the consideration of the claim, set up by the complainants, to the property in controversy. And, in stating the conclusions of the court on the points presented in this case, it is not regarded as necessary to refer, with great minuteness, to the allegations of the parties, as set forth in the bill and answer; nor to the great mass of documentary proofs read, and analyzed, and largely and ably discussed by counsel on the hearing. There is, in truth, very little conflict between the parties as to the facts involved in the controversy. The questions arising in the case are mainly those of legal inference and construction. These, though not numerically formidable, open a wide field for investigation, and are exceedingly important in their bearing upon the unfortunate controversy pending between the two portions of the great and respectable Methodist community in the United States. And no one, having a just comprehension of the character of the issues in this case, will allege that there was any waste of time or of mental effort in the protracted and able arguments of counsel, in the presentation of their points, on the hearing.

It is distinctly assumed by the complainants, in their bill, and strenuously urged by their counsel, as the basis of a decree of this court, for the apportionment and division of the property and funds in dispute, that the Methodist Episcopal Church in the United States, as it existed prior to and at the time of the action of the general conference of 1844, and the proceedings that were the sequences of that action, is no longer one church, but two churches; which, though alike in faith, doctrine, and discipline, are entirely separate and distinct in their organization. After stating, at length, the resolutions adopted by the general conference on the 8th of June, in the year just named, designated as the "Plan of Separation;" also, the proceedings of the convention of delegates, held at Louisville, on the 1st of May, 1845, and the resolutions of the council of bishops at New York, on the 2d of July, in the same year, the bill alleges, "that by and in virtue of the foregoing proceedings, the Methodist Episcopal Church in the United States, as it existed before the year 1844, became and was divided into two distinct Methodist Episcopal Churches, with distinct and independent powers and authority, composed of the several annual conferences, charges, stations, and societies, lying and being north and south of the aforesaid line of division."

As the proceedings referred to present one of the most important questions arising in this case, it will be proper to notice them here with some particularity. The first of the resolutions embodied in the so-called "Plan of Separation" is in these words: "Resolved, by the delegates of the several annual conferences, in general conference assembled, 1. That should the annual conferences in the slaveholding states find is necessary to unite in a distinct ecclesiastical connection, the following rule shall be observed with regard to the northern boundary of such connection: All the societies, stations, and conferences, adhering to the Church in the South by a vote of the majority of the members of said societies, stations, and conferences, shall remain under the unmolested pastoral care of the Southern Church; and the ministers of the Methodist Episcopal Church shall in no wise attempt to organize churches or societies, within the limits of the Church South; nor shall they attempt to exercise any pastoral oversight therein, it being understood that the ministry of the South reciprocally observe the same rule in relation to stations, societies, and conferences, adhering, by a vote of the majority, to the Methodist Episcopal Church; provided, also, that this rule shall apply only to societies, stations, and conferences, bordering on the line of division, and not to interior charges, which shall, in all

cases, be left to the care of that Church within whose territory they are situated. 2. That ministers, local and traveling, of every grade and office in the Methodist Episcopal Church, may, as they prefer, remain in that Church, or, without blame, attach themselves to the Church South. 3. Resolved, by the delegates of all the annual conferences, in general conference assembled, that we recommend to all the annual conferences, at their first approaching sessions, to authorize a change in the sixth restrictive article, so that the first clause shall read thus: 'They shall not appropriate the produce of the Book Concern, nor of the chartered fund, to any other purpose other than for the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their wives, widows, and children, and to such other purposes as may be determined upon by a vote of two-thirds of the members of the general conference.' " 4. Provides, that when the general conference shall have voted to concur in the proposed change of the sixth restrictive rule, the agents at New York and Cincinnati shall, and they are hereby authorized and directed to deliver over to any authorized agent or appointee of the Church South—should one be organized—all notes and book accounts against the ministers, church members, or citizens within its boundaries, with authority to collect the same for the sole use of the Southern Church; and the said agents shall also convey to the aforesaid agent or appointee of the South all the real estate, and assign to him all the property, including presses, stock, and all right and interest connected with the printing establishments at Charleston, Richmond, and Nashville, which now belong to the Methodist Episcopal Church. 5. Provides, that when the change in the sixth restrictive rule shall be made, there shall be transferred to the agent of the Southern Church, so much of the produce and capital of the Methodist Book Concern, as will, with the notes, book accounts, presses, etc., mentioned in the last resolution, bear the same proportion to the whole property of said Concern, that the traveling preachers in the Southern Church shall bear to all the traveling ministers of the Methodist Episcopal Church; the divisions to be made on the basis of the number of preachers in the forthcoming minutes. 6. Directs the manner in which the payments and transfer shall be made. 7. Appoints commissioners to carry into effect the arrangements, etc. 8. Directs the agents at New York to act in concert with Southern agents, in carrying out the resolutions, etc. "9. That all the property of the Methodist Episcopal Church, in meeting-houses, parsonages, colleges, schools, conference funds, cemeteries, and of every kind, within the limits of the Southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal Church, so far as this resolution can be of force in the premises." The tenth, eleventh, and twelfth resolutions are not important.

The first resolution of the Louisville convention is the only one necessary to be set forth. It is as follows: "Be it resolved by the delegates of the several annual conferences of the Methodist Episcopal Church, in the slaveholding states, in general convention assembled, that it is right, expedient, and proper, to erect the annual conferences represented in this convention, into a distinct ecclesiastical connection, separate from the jurisdiction of the general conference of the Methodist Episcopal Church, as at present constituted; and accordingly, we, the delegates of said annual conferences, acting under the provisional 'Plan of Separation,' adopted by the general conference of 1844, do solemnly declare the jurisdiction hitherto exercised over said annual conferences, by the general conference of the Methodist Episcopal Church, entirely dissolved; and that the said annual conferences shall be, and they hereby are constituted, a separate ecclesiastical connection, under the provisional 'Plan of Separation' aforesaid, and based upon the discipline of the Methodist Episcopal Church; comprehending the doctrines and entire moral, ecclesiastical, and economical rules and regulations of said discipline, except only in so far as verbal alterations may be necessary to a distinct organization, and to be known by the style and title of the Methodist Episcopal Church South."

These, then, are the proceedings by force of which, it is insisted, a division of the Methodist Episcopal Church has been legally and constitutionally effected; and that, as a necessary result, all rights of property pertaining to the complainants, and those they represent, as traveling preachers of that Church, belong to them in their connection with the Church South. I may be permitted here to remark, that, in the investigation of this subject, I am impressively reminded of the responsibility of my position, and readily concede that, however satisfactory to my own mind, may be the conclusions to which I am conducted, other minds, of equal candor and greater strength, may reach a very different result. In dealing with the proposition now to be considered, as well as others involved in this controversy, it has been my aim studiously to exclude all merely extrinsic considerations, and to ascertain the true standing of these parties in a court of equity, as connected with a question of property. In this pursuit I am not at liberty to obey the mere promptings of sympathy, and thereby disparage well-settled principles; or, under the pressure of any supposed exigency, so to pervert or misapply established maxims of construction as to turn away the stream of justice from its wonted channel. It is an error too prevalent, especially out of the legal profession, to suppose that a chancellor, for the purpose of reaching a seeming equity, may yield himself to the guidance of an unregulated and latitudinous discretion, without examining too closely or scanning

too severely, the legal posture of the parties before him. Such, however, is clearly a perverted view of the powers and duties of a court of equity. In practice, it cannot fail to work disastrously; putting afloat, on the sea of uncertainty, the most valued civil and social rights.

It is obvious that the question of the power of the general conference to adopt the "Plan of Separation"—assuming that it was intended to divide and dismember the Methodist Episcopal Church, and that it has legitimately resulted in division and dismemberment—is decisive of the rights of the parties, as involved in this suit. If the complainants, and those they represent, have placed themselves on the basis of the authoritative and constitutional action of the general conference, they have the same rights which pertained to them before the severance of the Church; but, if the conference has, in this act, transcended its just constitutional powers, to that extent, its acts are void: and the complainants occupy the position of those who, voluntarily and without sufficient warrant, have placed themselves out of the pale of the Methodist Episcopal Church, and are no longer of that class of persons, who are the designated beneficiaries of the charity in question. In other words, they must show a present, existing right to a participation in the benefits of that charity, to justify the decree which they ask for, at the hands of this court. The views of counsel are widely variant, as to the nature and effect of the "Plan of Separation." On the part of the complainants, it is urged with great earnestness, that the division, as contemplated and provided for, by this plan, involves a mere change in the organization of the Methodist Episcopal Church; not destructive of its unity and integrity; because the dissevered parts are of the same faith, and under the same form and constitution of government, and in the pursuit of the same great purposes. It is contended, that the power to change, so far as mere organization is concerned, has always been recognized and acted upon by the Methodist Church; that, from the very genius of Methodism, it must change its organization, whenever it is necessary to promote its efficiency, and subserve the great purpose which it avows, of promulgating the Gospel to all men, and "spreading Scriptural holiness through these lands;" and that this power to change, not being prohibited expressly by the constitution, necessarily vests in, and pertains to the general conference, as the supreme power of the Church. On the other hand, it is insisted, with equal zeal, that unity of organization, as well as of faith and doctrine, is an essential element of all associations of men in church relations, and that the overthrow and destruction of such an organization, imports the overthrow and destruction of the church itself. It is contended, therefore, that the "Plan of Separation," in the sense in which it is claimed to be operative by the complainants, as effecting a division of the church, is equivalent to its destruction; and that the general conference, as a delegate or representative body, acting under a constitution with express limitations of powers, and subject, moreover, to restrictions deducible by necessary implication, transcended its jurisdiction in the adoption of the "Plan of Separation;" and that, as a necessary consequence, the act is a mere nullity.

The question presented, it may be remarked, is not, whether there does or does not exist in the Methodist Episcopal Church, a power to destroy its organization, and entirely to reconstruct, not only its government and discipline, but to change its standards of faith and doctrine; but whether this power rightfully exists in the general conference. The power of change—of destruction itself—doubtless exists somewhere; but, if it has not been expressly delegated, it remains with those who are the original depositaries of all power. The inquiry is now presented, and it is certainly one of great materiality in this case: What are the constitutional powers of the general conference of the Methodist Episcopal Church, since the change of government, which took place in 1808? It is not necessary here to inquire, what were the powers of the body called the general conference, which existed in the church from the year 1792 till 1808. It may perhaps be conceded, that previous to the last-named year, the general conference, composed as it was of the entire body of preachers in the traveling connection, in the absence of any constitutional limitations, was invested with the supreme power of the Church. They possessed in themselves, all the elements of sovereignty, and were amenable to no power but that of the Most High. From my examination of the history and polity of the Church, I can not perceive that the laity, whatever may have been their indirect influence in its government, have ever been recognized as one of its constituent elements; and if the general conferences subsequent to 1808 can be regarded as the rightful successors of the prior conferences, in the sense of being transferees of all their powers, it would result that these bodies possessed, and still possess, plenary power to divide, or otherwise disorganize and destroy the Church. And the general conference of 1844, instead of creating two Churches, as the complainants insist they have done, could have multiplied them without limit, and have placed each portion of the divided unit on the basis of a distinct and independent Church. It is undeniable, that the power of division, imports a power to divide indefinitely; and as a necessary consequence, division carries with it the destruction of the being and identity of the original Church.

The inquiry into the powers of the general conference, under the constitution of 1808, requires a brief reference to some facts con-

nected with the early history of the Methodist Episcopal Church in this country. The introduction of Methodism here dates back to the year 1766. For the seven years which succeeded, the affairs of the Church were conducted by quarterly conferences. No conference, composed of all the traveling preachers, was held till the year 1773. From this period, till the year 1783, there was no assembly of all the traveling preachers, but local conferences, at different places, were held, as might suit the convenience of the ministers. Till the year 1783, no rule had been adopted making it the duty of the traveling preachers to attend the conferences; such an order was passed at the conference held that year. It was not, however, till the year 1784, that the Church was fully organized as an independent Church. This measure was adopted pursuant to the advice and recommendation of John Wesley, in his letter to Doctor Coke and others, of Sept. 10, 1784. At a meeting of preachers, held on the 15th November of that year, at which the superintendents — Asbury and Coke — were present, this letter was submitted to, and approved of by those in attendance. They accordingly called a conference, which met at Baltimore, on the 25th of December, 1784; and hence is called the Christmas conference. The call embraced all the traveling preachers; and at the time appointed, sixty of the eighty-three preachers then in the connection, attended. They organized the Church and adopted a form of government, with a system of discipline, and a standard of doctrine and faith, and elected Asbury and Coke, bishops, or superintendents. From this time, Wesley ceased to claim or exercise any authority over the Church, and the supreme power vested exclusively in the whole body of the traveling preachers. The first general conference after the organization of the Church, in 1784, was held on the 1st of November, 1792, and was composed of all the traveling preachers, who had been received into full connection. This is considered as the first regular general conference. Similar conferences were held in the years 1800, 1804, and 1808. In 1806 Bishop Asbury submitted a paper to the annual conferences, recommending the calling of a conference at Baltimore, in the month of May, 1807, to be composed of seven delegates from each of the seven annual conferences. According to the statement of Doctor Bangs—2d vol. History of the Methodist Episcopal Church, page 177 —among the reasons set forth by the bishop in favor of this measure, were the following: "To provide for a more permanent mode of Church government;" and, also, "to provide for a future delegated general conference, whose powers should be defined and limited by constitutional restrictions;" "for hitherto," says the historian, "the general conference possessed unlimited powers over our entire economy." This proposition for a change in the form of government, received

the assent of all the annual conferences, except that of Virginia. Its defeat there, led to the abandonment of the plan for a time. The project was revived in 1808, by a memorial from the conference of New York, urging its adoption; and the conference of 1808 agreed to the proposed change, and adopted a constitution, providing in future for a delegated or representative general conference. The first article of this constitution provides that the general conference shall be composed of one member for every five members of each annual conference, to be appointed by seniority or choice, at the discretion of such annual conference; yet so that such representative shall have traveled four full calendar years, etc. By the 2d article it was provided that. "The general conference shall meet on the first day of May, 1812, in the city of New York, and thenceforward once in four years perpetually; in such place or places as shall be fixed by the general conference from time to time," etc. The 3d article requires, "that it shall take two-thirds of the representatives of all the annual conferences to make a quorum for the transaction of business." The grant of power to the general conference is in these words,

"The general conference shall have full power to make rules and regulations for our Church, under the following limitations and restrictions," namely, (1) The general conference shall not revoke, alter, or change, our articles of religion, nor establish any new standards or rules of doctrine, contrary to our present existing and established standards of doctrine. (2) They shall not allow of more than one representative for every five members of the annual conference, nor allow of a less number than one for every seven. (3) They shall not change, or alter, any part or rule of our government so as to do away episcopacy, or to destroy the plan of our itinerant general superintendency. (4) They shall not revoke or change the general rules of the united societies. (5) They shall not do away the privileges of our ministers or preachers of a trial by a committee, and of an appeal; neither shall they do away the privileges of our members of a trial before the society, or by a select number, or of an appeal. (6) They shall not appropriate the produce of the Book Concern, or of the charter fund, to any purpose other than for the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their wives, widows, and children. (7) Provided, nevertheless, that upon the joint recommendation of all the annual conferences, then a majority of two-thirds of the general conference succeeding, shall suffice to alter any of the above restrictions.

From this hasty sketch, the conclusion seems to follow, that in 1808 an important change took place in the government of the Methodist Episcopal Church. Before that time, the supreme power of the Church was vested, undeniably, in the whole body of trav-

eling ministers belonging to the connection. All the general conferences, from that held in 1784 to that of 1808, were composed of these ministers; not in the character of delegates, but each one in his primary capacity, and as a depositary of a portion of the sovereign power. They were called general conferences, because all traveling preachers, who had been in the connection for the requisite time, were invited to attend, and were members of those bodies in virtue of their offices as preachers. They were thus designated in contradistinction to the irregular local conferences, which had been previously held between the meetings of the general conferences. This body of traveling preachers, met, in a conventional capacity in the conference of 1808, created a new organism, before unknown to the Church—a representative or delegate general conference—and invested it, not with all power, but so much only as they deemed necessary to the ends of its creation. They provided for its permanency, by declaring that it shall meet, thenceforward, "once in four years perpetually." Prior to this change, the government of the Church, so far, at least, as the structure and powers of the general conference were concerned, was essentially a democracy, in which the masses met together for the transaction of their business. But, under the constitution of 1808, this body was elective; its members being chosen by the annual conferences, according to a prescribed ratio of representation. Under the old system, the members of the general conference represented no body but themselves, and were amenable to no earthly power for their conduct; under the new system, they had constituents, to whom they were answerable; and they were limited in their powers by express constitutional restrictions. And it is nowhere expressly declared, nor is it fairly inferable from the facts of the case, that the general conferences subsequent to 1808, were the successors of those which had previously existed, or the transferees of the powers with which they were invested. Indeed, there are good grounds for the conclusion, that it was one of the main objects of the change, to provide for suitable limitations on the powers of the general conferences. True, the great accession of numbers to the Church—one of the cheering results of the faithful labors of the ministry—and her greatly-increased and rapidly-expanding territorial limits, rendered it highly expedient to constitute a delegated conference. It was injurious to the interests of religion, as well as inconvenient and burdensome to the ministry, that the whole body of laborers should be called from their respective fields, to attend the meetings of the general conference. Besides, at the period of the change, several new states had been added to the Union, the great western valley was fast filling up with settlers, and every thing betokened the vast extension of our limits, since so fully realized. Methodism had kept pace with the steadily-advancing wave of population; and the indi-

cations were clear, that the affairs of the Church could not be safely intrusted to the general conference, as constituted prior to 1808. But the intention of the framers of the constitution of 1808, is not left to mere inference or construction. It is most apparent, from the terms of the instrument itself, that it was not intended to invest the general conference with absolute or supreme power. In the six articles, which have been before quoted, and to which some attention will be given hereafter, the powers of the general conference are expressly restricted; and these restrictions are wholly inconsistent with the assumption of unlimited power in that body. The general grant of power, as already noticed, is, "to make rules and regulations for our Church," subject to the restrictive articles. It is not pretended that there is any express grant of power to divide the Church, or otherwise interfere with its organization, so as to destroy, or in any way affect, its unity or perpetuity. If such a power exists, it must be deduced from the general grant, "to make rules and regulations." The general conference, in the exercise of its jurisdiction, can look only to the written charter of its creation; and I take it to be a settled canon of interpretation, in reference to all bodies possessing merely derived or delegated powers, and acting under a written constitution, that they can take none, not expressly granted, or clearly implied as necessary to the exercise of those that are granted. What, then, is the nature and the extent of the power vested in the general conference, by the clause of the constitution of 1808, granting "full powers to make rules and regulations for our Church?" Does it fairly imply a right to divide or dismember the Church? This is clearly a very important inquiry in this case; for, if this power existed, and was actually exercised by the conference of 1844, it results, that the complainants are clearly entitled to the relief prayed for in their bill. On the other hand, if the power of severance is not vested in that body, the Methodist Episcopal Church still remains in its integrity and unity; and the defendants, as its accredited agents, are rightfully in the possession of the charity in controversy, without a shadow of doubt as to who are its proper beneficiaries. And, upon this state of case, there would be no just ground for the interference of a court of equity, to withdraw it from their custody and control, and decree its distribution, cy-pres, or otherwise.

It may be remarked here, that this claim, urged by the complainants in behalf of the general conference, to the supreme and unlimited control over the Church, in all cases in which the exercise of their powers are not expressly restricted, is certainly one of a very imposing character. It is no less than the claim of a power to divide, or remodel, or otherwise destroy, the Church in its organization, at their own will and pleasure. Upon such a claim of power, nothing can rightfully be left to presumption in favor of its existence; it must be sustained by clear, affirmative rea-

sons. Under the influence of a proper jealousy of such a claim, a court will be inclined to act upon the rational intendment, that all power not granted, is reserved to those who were its original depositaries. In this age, and in the light of our republican institutions, this may be affirmed to be a safe rule of construction. The power "to make rules and regulations for our Church," must be construed as referring to the Church in its organization. It is impossible to conceive of the existence of a church, associating together through human agency or instrumentality. without connecting with it the idea of organization. It is this alone that makes it an entity—a thing cognizable by the senses—acting and capable of being acted on. It is true that theologians properly recognize a church on earth—universal, spiritual, and invisible—which is without organization. It embraces in its wide-spread arms, all human beings, in all the realms and climes of the earth, without respect to name, sect, or denomination, and whether included or not in any visible, external church relation, who yield their cordial assent to, and sincerely and obediently practice in their lives, the great fundamental, revealed truths of the Christian religion. Though without organization its members have "one Lord, one faith, one baptism," and are bound together "in the unity of the faith, and of the knowledge of the Son of God." In any other sense, there can be no church without an organization; it is the essential element of its being, and its destruction is necessarily the destruction of the being itself.

It is claimed, as a fair construction of the power granted to the general conference—a body vested only with a delegated authority —that the power "to make rules and regulations for our Church," implies the right to adopt any measure deemed expedient by that body, so far as organization is concerned. It may declare the Methodist Episcopal Church —it is insisted, now existing as a unit, bound and acting together in one compact organization—under the control of one regularly-appointed and constitutional general conference —to be two or more distinct and independent Churches, each having a general conference of its own, with no communion or fellowship, one with the other, except that which results from a common faith. Can it be that the constitution of 1808 vests, or intended to vest, in the general conference such a power? If it exists, the destinies of the Methodist Episcopal Church are completely at the disposal of any general conference; and that body may, at any time, at its own discretion and upon its own mere motion, on the occurrence of a sudden and unforeseen emergency, and without knowing or taking any measures to ascertain, the will of their constituents, take down and demolish their entire organization. This, it seems to the court, is a power inconsistent with the power "to make rules and regulations." The power granted is one designed to be exerted for the Church, in the adoption of such measures as shall best insure its efficiency and prosperity. The "rules and regulations" must, therefore, be adapted to the nature and purposes of the organism, committed to the care and guardianship of the conference. And any exercise of its authority, resulting in the overthrow and demolition of the Church, must be viewed as repugnant to, and in violation of, the granted power. Nor does it change the aspect of the question, that while there are specified restrictions in the exercise of the powers of the general conference, the right to change or destroy the existing organization of the Church is not enumerated as one of them. The founders of the constitution of 1808 may well be presumed to have given their assent to it, from the deep conviction that it was well adapted to secure and promote the well-being of the Church. To have inscribed in it, as among the restrictions of the constitution, that the general conference should at no time divide or destroy the Church, would have involved an absurdity. The implication of such a prohibition would necessarily result from the character and purposes of the constitution. Upon any other principle the power to govern may be held to imply a power to destroy. Such an implication is not admissible, even in the case of a civil ruler or sovereign, invested with the most absolute power. It is an acknowledged principle, that governments are instituted to promote the happiness and the welfare of the governed; and every investiture of power is made with the implied pledge, that it shall be exercised to that end. This doctrine applies as well to ecclesiastical as to civil governments. The grant of power to the general conference, under the constitution of 1808, must be construed in subordination to this great principle. That body is the mere depository of certain delegated powers; and, as it seems to the court, can not, upon any just principle, in the absence of an express grant of such a power, destroy the organization in virtue of which it has been brought into existence, by division, or otherwise. And, as already indicated, the fact that the general conference is not, by an express provision, inhibited from the exercise of the power to divide or destroy the Church, does not furnish a foundation for an inference in favor of its existence.

This view of the powers of the general conference of the Methodist Episcopal Church is not now, for the first time, asserted and maintained. There is evidence before the court, in this case, that it has been heretofore insisted on, with great ability, by some of the most distinguished individuals of that Church. The proof of this is found in various parts of the documentary evidence submitted to the court. Some of these will be briefly noticed. In the first place, it may be remarked, that the doctrine of the limited nature of the constitutional power of the general conference is strongly asserted and ably maintained in the protest of the minority in Bishop Andrew's case. In this paper it is

said, "The general conference is in no sense the Church, not even representatively. It is merely the representative organ of the Church, with limited powers to do its business in the discharge of a delegated trust." 1 Proofs, 108. And again, in the pastoral address of the Louisville convention, the same idea is reasserted in this language, "The general conference, or a majority thereof, is not the Church." 2 Proofs, 65. And the report of the committee of the annual conference of Alabama, which was adopted by that body, strongly and unqualifiedly asserts the same principle. After admitting the right of a conventional meeting of the whole Church to change or revolutionize it, either in doctrine or in organization, it is said in this paper: "But before the general conference can plead this right, (referring to the case of Bishop Andrew,) it must show when and where such plenary power was delegated to it by the only fountain of authority—the entire pastorate of the Church." 2 Proofs, 51. In the report of the committee on organization in the Louisville convention, in discussing the rights and powers of the episcopacy and the general conference, it is said, "It is confidently, although most unaccountably maintained, that the six short restrictive rules, which were adopted in 1808, and first became obligatory, as an amendment to the constitution, in 1812, are, in fact, the true and only constitution of the Church. This single position, should it become an established principle of action to the extent it found favor with the last general ·conference, must subvert the government of the Methodist Episcopal Church. It must be seen, at once, that the position leaves many of the organic laws and most important institutions of the Church entirely unprotected, and at the mercy of a mere and ever-fluctuating majority of the general conference." 1 Proofs, 86, 87. And, again: "This theory assumes the self-refuted absurdity, that the general conference is in fact the government of the Church, if not the Church itself." 1 Proofs, 87. Again: "With no other constitution than these mere restrictions upon the·power and rights of the general conference, the government and discipline of the Methodist Episcopal Church, as a system of organized laws and well-adjusted instrumentalities for the spread of the Gospel and the diffusion of piety, and whose living principles of energy and action have so long commanded the admiration of the world, would soon cease even to exist." 1 Proofs, 87. This argument was directed against the asserted power of the general conference as exercised in the case of Bishop Andrew; but it is not less applicable, or forcible and conclusive in regard to the present question, than to the case so ably discussed by the committee. This committee, then, denounce as "wild and revolutionary" the claim "that the general conference may do, by right, whatever is not prohibited by the restrictive rules; and, with this single exception, possess power supreme and all-controlling, and this, in ·all possible forms of its manifestation—legislative, judicial, and executive—the same men claiming to be, at the same time, both the fountain and the functionaries of all the powers of government, which powers, thus mingled and concentrated into a common focus, may, at any time, be employed at the promptings of their own interests, caprice, or ambition." 2 Proofs, 88.

These references, for the purpose indicated, are deemed quite sufficient. They show that the greatest minds in the Church did not regard the constitution of 1808 as conferring absolute power on the general conference, limited only by the "six short restrictive rules." And they prove, by a power of argument not easily resisted or overcome, that there were implied restrictions on the power of that body, not less stringent and authoritative than those expressly declared; and, moreover, that the safety, efficiency, and perpetuity of the Church were directly involved in the recognition and rigid observance of these implied restrictions. That these arguments are applied to a case, differing in its aspects from that now under consideration, in no wise detracts from their force. But this asserted supremacy of the general conference of the Methodist Episcopal Church, and its consequent authority to break up and destroy its organization, at any time, according to its views of expediency, it is insisted by the complainants' counsel, has the sanction of precedent. It is said the power was exercised in the Canada case, and that this case was, in all respects, identical with that now under consideration. It is insisted, therefore, that, as affording a construction given by the general conference to its powers, it is to be viewed as a settlement of the question. It is not proposed to enter upon an inquiry as to the authority of precedent on a question of disputed and doubtful constitutional power, when presented for judicial determination. Without doubt, a power long exercised, and having become a settled usage of the body claiming and exercising it, will be viewed as rightfully pertaining to it; and a court will not be disposed to open the door of inquiry in relation thereto. But the exercise of a power in a single instance can scarcely be claimed as proof of its existence, if not explicitly granted, and cannot, therefore, be viewed as entitled to the weight of an established precedent. What however, are the facts in the Canada case? The province of Lower Canada, previous to 1812, had been included in the Genesee conference. Afterward it was embraced partly in the New York conference, and partly in the New England conference; and later still the whole province was attached to the Genesee conference; but it never constituted a separate conference, under the authority of the general conference of the Methodist Episcopal Church in the United States. By reason of discords and painful collisions be-

tween the preachers laboring in that province belonging to the British conference, and those belonging to the general conference of the Church in this country, the latter, by an amicable arrangement, were wholly withdrawn from that field. This, however, in no way interfered with the existing organization of the Church, and involved the exercise of no doubtful power. The province of Upper Canada, at different periods intervening the years 1804 and 1820, had been included within several conferences of the Church in the United States. At the general conference of 1820, a resolution was adopted authorizing the establishment of a conference in this province. This was done in 1824; and the conference was designated as the Canada conference, embracing within its limits the whole province. The Canadian Methodists were still embarrassed; and at the general conference of 1828, they presented a memorial to that body, expressing a wish to be disconnected from the Church in the United States, and to organize a Canadian Church on an independent basis. The reasons set forth by the memorialists were mostly of a political character, growing out of the fact that they belonged to a civil jurisdiction foreign to that of the United States. The committee to which this memorial was first referred, reported that it was unconstitutional to grant its prayer without the assent and approbation of the annual conferences. A substitute was offered for this, containing a preamble and several resolutions. The first resolution declared, that the compact existing between the Canada annual conference and the Methodist Episcopal Church in the United States be and hereby is dissolved by mutual consent. This resolution was adopted by a large majority; and the other resolutions were referred to a special committee. The committee reported a preamble and several resolutions, which were adopted. In the preamble it is recited, that the Methodist Episcopal Church of the United States had extended its jurisdiction over the Canadian Methodists at their express desire, and that they, "under peculiar and pressing circumstances, do now desire to organize themselves into a distinct Methodist Episcopal Church, in friendly relations with the Methodist Episcopal Church in the United States." The first resolution provides, in substance, that if the Canadian conference shall definitely determine on this course, and elect a superintendent, he may be ordained by any one of the bishops of the Methodist Episcopal Church. The second expresses a desire that the missionaries in Upper Canada, laboring under the care of the Church in the United States, may be permitted to continue, etc. The third resolution declares, that ministers and others should be furnished with the publications of the Methodist Episcopal Church on the same terms as their agents in the United States; and, that, while the Canadian Church continued to patronize the Book Concern, it should be entitled to its annual proportion of the dividends. Upon the adoption of these resolutions, the resolution of the previous committee, which had passed, was rescinded. The whole action of the general conference is, therefore, embodied in the resolutions reported by the last committee. These do not assert or pretend to claim any power in the general conference to authorize the separation of the Canada conference, from the Church in the United States. There had been a decided opinion, in the report of the first committee, that the conference could not constitutionally sanction such separation. And it seems that it was only because of the peculiar circumstances under which the jurisdiction of the Methodist Episcopal Church had been extended over the province, and the annoyance and disabilities under which its preachers and members labored, for the reasons before stated, that the general conference was induced to take any action in the case. In their action they asserted no claim to any power to authorize the separation of the Canada conference, but simply declared certain friendly terms on which that conference might withdraw. It was upon the suggestion of Bishop Emory, that this conference had been recognized as a part of the Methodist Episcopal Church, on principles wholly variant from those which applied to the conferences in the United States, that the general conference assented to its withdrawal on the terms embraced in the resolutions which were adopted. 3 Bangs, Hist. 390, 391. Without enlarging on this point, it may be sufficient to remark, that the proceedings in the Canada case furnish no parallel to the action of the general conference of 1844, in so far as the latter can be construed into an authorized division of the Church. So far from this, the general conference, in the Canada case, give a very intelligible negative to the possession or exercise of any such jurisdiction without first having obtained the assent of the annual conferences. The application of the Canada conference for an apportionment of the proceeds of the Book Concern, and the proceedings connected with it, will be noticed in another place.

There is another very important inquiry in this case, which may be stated thus: If the power of division properly belonged to the general conference, was it, in fact, exercised by that body? It has been before intimated, that there exists somewhere in the Church, a power to change, overturn, and destroy, not only its organization, but its system of doctrine and discipline. If it is not in the general conference, it is not, perhaps, material to inquire where it vests; though this court has no hesitancy in holding that such a power would belong to the body of the traveling ministry, assembled en masse, in a conventional capacity. It was precisely such a body that in 1784 gave the Church an organized existence in this country; and

such a body could, without doubt, change its entire polity. Perhaps, too, this power could be invested in a convention, constituted on the representative principle; but it would be necessary, in such a case, that the delegates should be elected with express reference to the question of a change of government, and should be clothed by their constituents with ample powers to perform that specific function. But clearly the existence of this power, either in a convention composed of all the traveling preachers, or of delegates elected by them to revise or remodel the government of the Church, strongly negatives its existence in the general conference under the constitution of 1808. If such a power existed, and was intended to be exerted by the general conference of 1844, it may be presumed, from the known intelligence of that body, that the object proposed would have been consummated by direct and straightforward action. Now, it is not pretended that the "Plan of Separation" is operative in itself to authorize a division of the Church; it is only as connected with the action of the Louisville convention that such effect can be claimed for it. In fact, the first resolution of the "Plan" refers the decision of the question of the necessity and expediency of a separation, to the conferences of the slaveholding states. Its language is, "Should the conferences of the slaveholding states find it necessary to unite in a distinct ecclesiastical connection." There is no requisition that their proceedings shall be reported to the general conference, or be submitted to all the annual conferences for ratification or approval; but the decision of the Southern conferences is made final. The power of the general conference, so far as it professed to exercise any in this matter, was clearly a legislative power. Indeed, if intended to work the division and dismemberment of the church, it is not easy to conceive of a higher function of legislation than that claimed for the conference. The grave inquiry is here presented, could it delegate to another body the exercise of such a power? Nothing is hazarded in the proposition, that such a power, from its very nature, is not transferable. In their report to the Louisville convention, the committee on organization place their right to act in the premises expressly on the ground of, authority derived from the general conference. They say "that all the right and power of the general conference, in any way connected with the important decision in question, were duly and formally transferred to the annual conferences in the slaveholding states, and exclusively invested in them." 2 Proofs, 69. The committee then proceed with an argument, based on this proposition, to prove that they have full power to act. Now, it is a common usage, in legislative bodies, to institute commissions to inquire into facts, and to report facts, as a basis of intelligent and wise legislation; but such a

body cannot delegate to others its legislative discretion. The general conference could not, therefore, transfer to the Louisville convention the power to pass upon the very solemn question of a division and dismemberment of the Church. They could, with equal propriety, have conferred this power on the bishops of the slaveholding conferences, or the presiding elders, or any designated number of ministers or laymen. This no one will insist could have been done. This view may be applied in a two-fold aspect: First, as proving a lack of power in the Louisville convention to divide the Church, so far as they professed to act under the authority of the general conference; and, second, as raising a strong presumption that the general conference, by the action of 1844, did not divide the Church, and did not intend to do so. It would be doing injustice to that most respectable body, to suppose they intended to delegate to others the exercise of a high function, pertaining to them as a legislative body.

But the inquiry remains, do the acts of the general conference of 1844 justify the inference, that there was a serious purpose to divide the existing Church, and from its dissevered parts, to create two distinct and independent Churches? If this was intended, it is not unfair to suppose it would have been clearly and intelligently expressed. It was a subject of the most momentous interest; and in passing upon it, it would occur to every one that nothing should be left to doubtful inference or construction. But, in looking into the proceedings of the general conference, in connection with the debates, no evidence is afforded that the body either asserted or attempted to exercise such a power. That ever-fruitful source of agitation and excitement—the subject of slavery—in connection with the cases of Harding and Bishop Andrew, became a topic of discussion in the general conference of 1844. It is not, perhaps, uncharitable to suppose, that, even among the excellent and pious men composing this body, there was some excess of zeal and temper, and, consequently, some indiscretions, on both sides, during the long and animated debates which took place. There had been some previous causes of excitement and ill feeling, growing out of the alleged ultraism of some Northern preachers, in connection with the question of slavery. And it is not strange that, from the collisions of a warm discussion of the subject, in the conference, some sparks of unholy fire should have been thrown off. As usual under such circumstances, the minority supposed they were oppressed by an imperious majority. Of course, there would be some alienation of feeling—some disruption of the holy ties of Christian brotherhood. In this state of things, the idea of a separation of the seemingly discordant elements took possession of some of the leading men of the South and southwestern portions of

the Church. This idea was at length bodied forth in the form of a specific proposition, by Dr. Capers—now a bishop in the South, justly distinguished for his talents and his piety—who introduced a series of resolutions, the first two of which were as follows: "That we recommend to the annual conferences to suspend the constitutional restrictions which limit the powers of the general conference, so far, and so far only, as to allow the following alterations in the government of the Church; namely, that the Methodist Episcopal Church in these United States and territories, and the republic of Texas, shall constitute two general conferences, to meet quadrennially, the one at some place south and the other north of the line which now divides between the states commonly designated as free states, and those in which slavery exists. That each one of the two general conferences thus constituted shall have full power, under the limitations and restrictions which are now of force and binding on the general conference, to make rules and regulations for the Church within their territorial limits respectively, and to elect bishops for the same."

It is not necessary to refer specially to the other resolutions in the series offered by Dr. Capers. The whole were referred to a select committee of nine, who were not able to agree on a report; and they were not afterward brought to the notice of the conference. It will be seen that the resolutions cited contained the distinct proposition to refer the question of the division of the Church to the vote of the annual conferences; thus admitting a want of power in the general conference to authorize a division without a change in the constitution. As the matured opinion of a minister of the Church, of high standing and great experience, this proposition of Dr. Capers is entitled to consideration. But also, it deserves notice, that this proposal, looking to a division of the Church—clearly and explicitly stated—was allowed to drop without action; thus affording grounds for the conclusion, that, whatever other action it might be the purpose of the conference to take on this subject, they had no thought of a division of the Church on the plan proposed. And there is room for the further inference, that upon a proposal to refer the question of dividing the Church to the votes of the annual conferences, as the only constitutional mode by which it could be effected—if the power was understood to pertain to the general conference without such action—it is strange that no one was found to assert the power, and thus show the inutility of the proposed reference. But looking at the "Plan of Separation," as adopted by the general conference, does it fairly import anything more than a proposition intended to open a way for the peaceful withdrawal of the Southern and South-Western conferences, should they deem such a course expedient? The confer-

ence, it must be supposed, had in view the acknowledged right of any individual member, or any portion of the Methodist Episcopal Church to withdraw from its jurisdiction and government at their own pleasure. This right has been recognized from the earliest period of the Church. Mr. Wesley distinctly avowed that it was formed on the voluntary principle; and that as no one joined his societies on compulsion, so no one would be required to continue in the connection, except by his own choice and volition. It was the understood law of the Church, however, and the principle is clearly recognized in its discipline, especially in regard to ministers, that, while within the pale of its organization, strict obedience to her rules would be required. Ministers entered upon their solemn and self-denying duties with a knowledge of this principle, and also with a presumed reference to one of its sequences; namely, that if disconnected from the organized Church, either by discipline or voluntary retirement, they forfeited all the privileges and benefits pertaining to them while within its pale.

Keeping this principle in view, the court will briefly examine the "Plan of Separation." It has been inserted in a previous part of this opinion, and need not be here set out. And it is to be remarked, in the first place, that throughout the entire "Plan" there is no pretense or claim of power in the general conference to divide the Church, in the sense of creating from one Church, two distinct and independent Churches; nor is there any expression contained in it from which it is inferable that it was intended thus to divide it. And it cautiously guards against any admission of the necessity of a division. The first clause of the preamble refers to the declaration of the fifty-one delegates from the slaveholding conferences, representing that, for various reasons, "the objects and purposes of the Christian ministry and church organization cannot be successfully accomplished by them under the jurisdiction of this general conference as now constituted." The second clause declares, that, "whereas in the event of a separation, a contingency to which the declaration asks attention as not improbable, we esteem it the duty of this general conference to meet the emergency with Christian kindness and the strictest equity." Here, it will be noticed, the separation is referred to as a "contingency"—something that "may" happen—and when it does happen, as producing an "emergency" to be met with Christian kindness. The first resolution provides, "that should the annual conferences in the slaveholding states find it necessary to unite in a distinct ecclesiastical connection," etc. Here again the language is exceedingly guarded, asserting no power, or intention to divide the Church, and admitting no necessity for such division. It is perfectly intelligible without comment or exposition.

Should the conferences referred to "find it necessary," upon mature consideration, to withdraw from the existing organization, then the conditions are prescribed on which the withdrawal is to be consummated; and provision is made for the continuance of future friendly relations with the proposed new organization. This was a jurisdiction undoubtedly possessed by the general conference, and which had been previously exercised in the case of the Canada conference. It was merely saying to their brethren of the South, If you decide on leaving us, it is our desire that we may part in peace. And in the exercise of a power clearly belonging to the general conference, they fixed upon certain rules which should govern the border conferences and societies; they declared that all ministers might, at their pleasure, attach themselves to the Church South, if one should be formed, or remain in the Methodist Episcopal, without blame or censure; they agreed "that all the property of the Methodist Episcopal Church, in meeting-houses, parsonages, colleges, schools, conference funds, cemeteries, and of every kind, within the limits of the Southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal Church, so far as this resolution can be of force in the premises." To this extent the general conference supposed they had rightfully the power to act. There was one subject, however,—the charter fund and Book Concern,—which was not within their control, except for a specific purpose; namely, "the benefit of the traveling, supernumerary, superannuated, and worn-out preachers, their wives, widows, and children." This could not be appropriated in any way or for any purpose, other than that specified. In the fulfillment of the purpose declared, of meeting the "emergency" of a separation, should it happen, "with Christian kindness and the strictest equity," the general conference, therefore, referred it to the discretion and decision of the annual conferences, whether they would enlarge the power of the general conference, so as to enable it, by a vote of two-thirds of its members, to appropriate the charter fund and the Book Concern, as they might deem expedient; and they provided the terms on which the division of the Book Concern should take place, in the event that the annual conferences should vote in favor of the proposed alteration in the sixth restrictive rule. In all this there was certainly no claim of a power to divide the Church by the direct action of the general conference, or of any right to delegate such a power to the Southern conferences; it was merely a provisional arrangement, to meet a "contingency" which it was declared might happen. The debates in the general conference are clearly confirmatory of this view. I may here, without any intended discourtesy, refer to a speech of Doctor William A. Smith, one of the complainants in this case —a minister distinguished by his gentlemanly deportment, his piety, learning, and intellectual power—made in Bishop Andrew's case, in which he insists, if certain doctrines are persisted in, "a division of our ecclesiastical confederation would become a high and solemn duty"; and adds, "This conference, I am aware, has no authority directly to effect this separation. This subject must go back to the organic bodies we represent—and to the people—the membership of the Church—who must be consulted, and whose voice must be regarded as an authoritative decision, from which there is no appeal." In the debate on the "Plan," there seems to have been some diversity of view, in relation to its effect. Many of the speakers spoke, and, no doubt, voted, under a belief, that no part of the "Plan" could take effect, till the annual conferences had concurred in the proposed change of the sixth restrictive rule. Doctor Paine said, "The separation would not be effected by the passage of these resolutions through the general conference; they must pass the annual conferences, beginning at New York; and when they came round to the South, the preachers there would think and deliberate, and feel the pulse of public sentiment, and of the members of the Church, and act in the fear of God, and with a single desire for His glory." Again: "They should be one people still, till it was formally announced by a convention of the Southern churches, that they had resolved to ask an organization, in accordance with the provisions of the report." The same gentleman said, at another stage of the debate, "that the subject would go round, before it came to the South," etc. Doctor Luckey, in his remarks said, "He regarded the resolution as provisionary and preliminary, settling nothing at present, but providing, in an amicable and proper way, for such action as it might be necessary hereafter to take. He hoped such necessity would never arise, and that Southern brethren would not find it necessary to leave them." Doctor Bangs said, "The speakers who have opposed the report have taken entirely erroneous views of it. It did not speak of division; the word had been carefully avoided through the whole document; it only said, in the event of a separation taking place; throwing the responsibility from off the shoulders of the general conference, and upon those who should say such separation was necessary." Mr. Fillmore in his remarks said, "The resolutions do not say that the South must go, shall go, will go, or that anybody wants them to go; but simply makes provision for such a contingency." Mr. Finley said, "He could see in the report no proposition to divide the Church; if he saw such a proposal, he should stop at the threshold." Mr. Hamline argued against the necessity of referring all the resolutions embodied in the report of the committee, to the annual conferences, insisting that it was only necessary to refer

that relating to the sixth restrictive rule; and saying, "The Book Concern is chartered in behalf of the general Methodist Episcopal Church of the United States; and if they did separate till only one state remained, still Methodism would remain the same, and it would still be the Methodist Episcopal Church in the United States." Again: "If they sent out to the annual conferences to alter one restrictive rule (the sixth) it would be constitutional to divide the Book Concern, so that they might be honest men and ministers. The resolution goes on to make provision, if the annual conferences concur, for the security and efficiency of the Southern conferences." And, continuing, he said, "God forbid that they should go as an arm torn from the body, leaving the point of junction all gory and ghastly." The same speaker also said, remarking on the action of the committee, "They had carefully avoided presenting any resolution which should embrace the idea of separation or division." Mr Porter said, "The committee had presented that report as the best thing that could be done under the circumstances." Again: "If there were defects in the document, they could arrest it in the annual conferences. The South could take no action upon it, till the annual conferences had decided respecting the sixth rule; and if, when they got home and calmly and deliberately examined it, they found anything radically wrong, let them stop it in the annual conferences."

Without extending these quotations, it will be seen that, in the debate on the "Plan of Separation," the idea was promptly repelled, that in its adoption the general conference was giving its sanction to a division of the Church; and that, so far from showing such an intention, all expressions justifying the inference were cautiously avoided in the "Plan" itself. It seems also clear, that the conference designed to act expressly on the principle avowed by Doctor Bangs, of "throwing the responsibility from off the shoulders of the general conference, and upon those who should say such separation was necessary." It is equally clear, that the proceedings of the Louisville convention do not warrant the conclusion, that they supposed the Church was divided by the action of the general conference, or by the joint action of the latter body and the convention, as claimed by the bill in this case. The convention, it may be remarked, was not a body known to, or recognized by, the constitution of the Church. Neither had it been called under the sanction or authority of the general conference; nor was that conference in any wise responsible for its doings. The "Plan of Separation" prescribed no mode by which the conferences of the slaveholding states should decide the question of the necessity of their withdrawal. The general conference had no right to do this, and did not assume to do it. It was left wholly to the choice and discretion of the South. It was decided to call a convention at Louisville; and this body declared "that it is right, expedient, and necessary to erect the annual conferences represented in this convention into a distinct ecclesiastical connection, separate from the jurisdiction of the general conference, as at present constituted." It was also declared, "that the jurisdiction hitherto exercised over said annual conferences, by the general conference of the Methodist Episcopal Church, was entirely dissolved," and that such annual conferences should be formed into "a separate ecclesiastical connection, to be known by the style and title of the Methodist Episcopal Church South." Provision was also made for a general conference of the Southern Church, at Petersburg, on the 1st of May, 1846, and quadrennially thereafter. These proceedings perfected the act of separation, or withdrawal—a result not brought about by the act of the general conference of the Methodist Episcopal Church, but by the decision of the Louisville convention. There is no ground for the charge that there was any concealment or unfairness in the conduct of the general conference of 1844. There is no difficulty in comprehending their motives and their actions. The vivid representations of Southern ministers, that unhappy consequences would result in the South from the decisions of the general conference in some matters connected with slavery—evils not then experienced, but apprehended,—induced that body to adopt such measures as were within its constitutional competency, to meet the threatened emergency, and mitigate, as far as practicable, the painful results likely to ensue from the withdrawal of the Southern conferences. This result was, no doubt, deemed probable; and, when it should happen, the laudable desire was evinced that it should take place without the total disruption of the ties of Christian brotherhood. The right of withdrawal was unquestionable, and was distinctly admitted by the North. There was but one barrier that stood in the way of this movement; and that was the constitutional difficulty of a division of the chartered fund and the Book Concern. This the conference was willing to remove, in the only mode by which it could be constitutionally effected. That body was expressly prohibited, by the sixth restrictive rule, from making any apportionment or division of these funds and property, except as prescribed by that rule, without authority from the annual conferences. A proposition was, therefore, submitted to these conferences for a modification of this rule, with a view to enlarge the powers of the general conference. They refused to concur in the proposed change, and this negative upon that measure left the general conference without any power further to act in the matter, except upon some future proposition of compromise. The Southern members were fully apprised of the difficulty adverted to, and a portion of them, evidently, were of the opinion that the entire "Plan of Separation" depended on the action of the annual

conferences, on the question of changing the sixth restrictive rule. In their address to the Southern churches, the delegates from the South, in the general conference of 1844, instead of censuring that body for its action on the property question, bear honorable testimony to "the spirit of justice and liberality" of the North, and say, that "should a similar spirit be exhibited by the annual conferences in the North, when submitted to them, as provided for in the 'Plan' itself, there will remain no legal impediment to its peaceful consummation."

On this state of facts, the inquiry is presented, whether this court, in the exercise of its equity jurisdiction, can rightfully take charge of the property and funds of the Book Concern, as a charity, and apportion them ratably among the parties to this controversy. If the position were sustainable that the Methodist Episcopal Church has been legally and constitutionally divided into two separate and independent Churches, it would result necessarily that the old Church is annihilated; and, not being an existing organism, can have no capacity to hold or administer the charity in question; and, in that aspect, there can be no doubt that a court of chancery, on the doctrine of cy-pres, could rightfully take jurisdiction and dispose of the charity, as nearly as possible, in conformity with its original purpose. On this supposition, the beneficiaries within either of the two church organizations would be placed on the same footing. They would have precisely the same rights, and would be equally without any of the requisite means to enforce them; for the agencies by which alone the charity could be administered would be destroyed with the demolition of the original Church to which they pertained. But this hypothesis is clearly not admissible. It needs no process of reasoning to show that the Methodist Episcopal Church is not destroyed. It still exists in name and organization, as it did prior to 1844. From that time to the present, it has been going forward in the discharge of its accustomed duties and functions. It has had, and still has, its bishops, its preachers, its membership, and a regular succession of its general, annual, and quarterly conferences. In short, the entire machinery of its organization has been in full operation to this day. True, the withdrawal of the Southern conferences has lessened the number of its members, and curtailed its territorial jurisdiction; but it is undeniably the same Church—the Methodist Episcopal Church —having all the essential elements of identity with the Church prior to 1844. This great ecclesiastical organism, has not, since that time, wrought its own destruction; nor has it been destroyed by any power or influence, ab extra. As the keeper of the charity in question, it has now the same power to hold, and precisely the same agencies to administer it, that it ever had. It has also beneficiaries capable of receiving and entitled to its benefits. In a word, its machinery is perfect in all that is required to manage and distribute the charity, according to the purpose of its creation. What is the position of the complainants in reference to this charity? In so far as they may be understood, from the bill, to claim a decree on the ground of their individual interests in the Book Concern, as belonging to the traveling connection, or as supernumerary or superannuated preachers, an insuperable objection seems to present itself. The legal nature of their interests, as individuals belonging to the one or the other of these classes, is not such that it can form a basis for a decree in their favor. The beneficiaries of this charity, as individuals, have no legal right to or interest in the fund. They have an inchoate right; but not such a one as can be recognized in law or equity. It is not capable of transfer or alienation. It bears no similitude to a co-partnership, a retiring member of which may call upon his associates for an account, and claim his specific proportion of the partnership fund or property. It is not every one, falling within the class of traveling, supernumerary, or superannuated preachers, or the wife, child, or widow of such, that is necessarily a beneficiary of this church charity. It can only be available to them under certain circumstances. It is only when it is made to appear to the proper annual conference, that after applying the contributions required by the law of the Church, to be raised for the support of these persons, there is a deficiency for this purpose, that they are entitled to assistance from the proceeds of the charter fund or the Book Concern; and then only for the amount of such deficiency. If, therefore, in any conference, the liberality of the people or membership is such, that means sufficient for the support of the beneficiaries of the general charity are raised, nothing is, or can be, drawn from it for that purpose; and all the inquiries to ascertain the fact of deficiency and its amount are made through the agency of the several annual conferences, who, upon the direction of the general conference, are the distributers of the charity, and deal it out to the individual beneficiaries as they show themselves entitled to it.

But if these complainants, and those they represent—forming the entire class of the beneficiaries within the Southern Church— having, as the bill assumes, an interest in this great charity, and averring that they have presented their claim to their just apportionment of it, and that such claim has been rejected; or, if they can show that the fund has been diverted from its rightful object, or that those intrusted with its administration have conducted it dishonestly or in bad faith, a ground is afforded for the interposition of a court of equity, in virtue of its acknowledged jurisdiction over charitable uses. But it will be obvious, that it is necessary that the claimants of the charity should make it appear that they are within the class of its beneficiaries. Now, in the present case, as has been already

stated, the complainants, and those they represent, base their claim on the fact that they were once in connection with the Methodist Episcopal Church, as traveling, superannuated, or supernumerary preachers, and are now, by the means and proceedings stated, within the Methodist Episcopal Church South, and, that in virtue of that ecclesiastical connection, are rightful beneficiaries of the charity in question. In the view of this court, as the result of its best judgment upon the legal import of those measures and proceedings, these complainants, in the exercise of their undoubted right, have withdrawn from the Methodist Episcopal Church by their own act and volition, and now belong to another ecclesiastical organization—holding, indeed, the same faith, but in every other respect distinct from, and independent of, that from which they have retired. And this presents the question, whether they are now to be regarded as belonging to the class of beneficiaries, having a rightful claim to a participation in the charity under consideration. This question, of course, presupposes the fact, undeniable in this case, that the sixth restrictive article of the constitution of the Church is in full force; the annual conferences not having enlarged the power of the general conference so as to permit the appropriation of the proceeds of the Book Concern to any other purpose, or in any other way, than that prescribed by the organic law of the Church. The inquiry, then, reduced to its simplest elements, is, whether any one not within the pale of the organized Methodist Episcopal Church, can be a beneficiary of the charity referred to. It is not intended to enter on the wide field of investigation which this subject presents, but very briefly to state the conclusions to which the court has arrived. The origin and nature of this charity have been already set forth. That its benefits were designed exclusively for those who continue within the organized Methodist Episcopal Church, seems to be a conclusion inevitable from the polity of the Church, and also from its usages. It has been before noticed, that the voluntary principle, in its greatest latitude, both in regard to admissions into the Church, and retirement from it, has always been an acknowledged and favorite principle with this Church. Any one—preacher or private member—has the right to withdraw from the Church at any time; but upon such withdrawal he abandons all right to property which pertained to him as a preacher or member. No one controverts this principle, as applicable to an individual. Every year there are more or less of the traveling preachers who withdraw from the connection; and cases also occur of their expulsion for misconduct. In either case, they forfeit all claims to a participation in the charities of the Church. The same principle applies where large numbers go off in a body, or where a conference, or any number of conferences secede. It does not vary the principle, that those thus seceding attach themselves to another ecclesiastical organization, holding the same faith as the Church from which they retire. They are no longer in the Methodist Episcopal Church, of which the charity, known as the Book Concern, is an appendage, and for which it was created. Upon any other principle, in the case under consideration, there could have been no necessity for asking the annual conferences to modify the sixth restrictive rule. It would have been competent for the general conference to have appropriated the produce of the Book Concern to the preachers of the Church South without a change of that rule, if they could be viewed as beneficiaries after their withdrawal from the old organization. This view is strongly sustained by the fact before noticed, that the law of the Church affords no rule by which the charity can be dispensed to those not in connection with some annual conference. It is only through the agency of the annual conferences that the fund can reach its beneficiaries. This view does not, of course, preclude the general conference, in cases within its just constitutional power, from making provision, by compact or compromise, for securing the just rights of withdrawing members or sections of the Church. This was the doctrine distinctly avowed and acted on in the case of the Canada conference. After its withdrawal from the Methodist Episcopal Church, an application was made to the general conference by that conference, for its ratable proportion of the produce of the Book Concern. It was held by the general conference that there was no authority in that body to authorize such a use of this fund. The question was submitted to the vote of the annual conferences; and such was the prevailing sentiment of the Church, that the Canada conference, by its withdrawal, had forfeited all claim to this charity, that the vote was largely against their application.

It is, however, strenuously urged by the counsel for the complainants, that the withdrawal of the Southern conferences, is justified on the ground of necessity; and that they cannot be viewed as having voluntarily separated from the Methodist Episcopal Church. It is insisted that the previous agitation and discussion of the subject of slavery, and the state of feeling in the Northern portion of the church in relation to it, in connection with the proceedings of the general conference of 1844, in the cases of the Rev. Mr. Harding and Bishop Andrew, involved the necessity of a separation. In the report of the committee on organization, adopted by the Louisville convention, the committee, after claiming ample authority to organize a new Church in virtue of the power conferred by the general conference in the "Plan of Separation," assume that there exists "a high moral necessity for the measure." The complainants, in their bill, set forth the subject as follows: "That differences and disagreements having sprung up in the Church, between what was called the Northern and Southern members, upon the ad-

ministration of the Church government, with reference to the ownership of slaves by the ministers of the Church, of such a character, and attended with such consequences as threatened fearfully to impair the usefulness of the Church, as well as permanently to disturb its harmony; and it became, and was, with the members of the Church, a question of very grave and serious importance, whether a separation ought not to take place, with some geographical boundary with necessary and proper exceptions, so as that the Methodist Episcopal Church should constitute thereafter two separate and distinct Methodist Episcopal Churches." This is the only statement in the bill of the difficulties connected with the subject of slavery. There is no specific reference to the action of the general conference, in the two cases mentioned, as affording the ground of the alleged necessity of separation; nor does the bill ask for a decree on the basis of the unavoidable withdrawal of the South as induced by that action. It is, perhaps, questionable whether, if the court should be of opinion that there was a necessity for the separation, a decree in the case could properly be based on that fact.

But, without delaying to consider this point it may be asked, do the facts in proof make out a case establishing the necessity of the withdrawal of the South, in the sense of taking from them the character and designation of seceders? Of course, this question must be dealt with in its legal aspect and bearings, as affecting the rights of the parties to this suit. It is easy to conceive of a state of things which might, in the opinion of well-balanced and pious minds, render it expedient and morally proper that the South should withdraw, which, however, would not involve a positive or legal necessity. In the view entertained by the court, there will be no occasion, in disposing of the point under consideration, to give a construction to the various provisions of the discipline of the Methodist Episcopal Church on the subject of slavery, intended, as far as practicable, to disconnect the ministry from holding slaves. There is no question, that while the position of that Church, from its origin in this country, has been generally wise, rational, and conservative on the subject of the institution of slavery, it has never ceased to bear testimony against the owning of slaves by the ministry. The legislation in the slaveholding states,—especially the stringent laws passed in the most of them prohibiting emancipation,—led, in 1840, to the modification of the rule, so that the holding of slaves in states where such a law was in force, should not be a disqualification for any official station in the Church. This was, in substance, the law of the Church in 1844. The general conference of that year had before it the two cases before named. Mr. Harding, a traveling preacher in the Baltimore conference, had become the owner of slaves by marriage. He was cited to answer for a violation of the law

of the Church for this act. The Baltimore conference, upon hearing the case, entered a judgment of suspension against him. He appealed to the general conference, and in that body the judgment of the annual conference was affirmed. Bishop Andrew, after his election, had also become the owner of slaves,—one by testamentary bequest, and one by marriage. In the Northern portion of the Church there was a decided feeling of dissatisfaction toward the bishop, arising solely from his connection with slavery; and a belief was prevalent that he had wounded the Church thereby, and violated the spirit, if not the letter of its law on this subject. By the discipline of the Church, a bishop is declared to be amenable to the general conference for improper conduct. The general conference of 1844 held, that under this clause in the discipline, it was competent to inquire into the fact alleged against the bishop. He was present at the conference, and made a full and candid statement of all the facts connected with his ownership of slaves. After a protracted discussion of the subject, the conference adopted the following preamble and resolution: "Whereas, the discipline of our Church forbids the doing any thing calculated to destroy our itinerant general superintendency; and whereas, Bishop Andrew has become connected with slavery by marriage and otherwise, and this act having drawn after it circumstances which, in the estimation of the general conference, will greatly embarrass the exercise of his office as an itinerant general superintendent, if not in some places entirely prevent it; therefore, Resolved, that it is the sense of this general conference that he desist from the exercise of his office, so long as this impediment remains." On a subsequent day of the session, the conference adopted the following resolutions explanatory of the foregoing: "Resolved, as the sense of this conference, that Bishop Andrew's name stand in the minutes, hymn-book, and discipline as formerly. Resolved, that the rule in relation to the support of a bishop and his family applies to Bishop Andrew. Resolved, that whether in any, and if in any, what work Bishop Andrew be employed, is to be determined by his own decision and action in relation to the previous action of this conference in this case." As before remarked, it is not designed to follow the counsel in their elaborate discussion of the question, whether the general conference, in the disposition made of these cases, have acted erroneously. I have not been able to perceive the materiality of this question as connected with the legal rights of the parties to this controversy. If it be admitted that the general conference of 1844 acted under a misapprehension of the law of the Church in relation to the holding of slaves by a minister or bishop, or misjudged as to its constitutional authority to take cognizance of the cases referred to, does it furnish a justifying reason for the secession of any

portion of the Church? This inquiry is not made with any view to the admitted right of voluntary withdrawal from the Church, whether with or without cause, but merely in reference to the ground assumed, that in this case it became a matter of necessity. It would seem that the Southern portion of the Church, claiming to be aggrieved by these proceedings, did not regard them as sufficient in themselves to justify secession on the ground of necessity; and hence, the proposition for a division was laid before the general conference for its consideration and sanction. But let us inquire if, upon any just principles, the withdrawal of the South admits of vindication, in the sense referred to. In the case of Mr. Harding, in a proceeding, understood to be judicial in its character, originating in the annual conference in which he was a traveling preacher, the general conference affirmed the judgment of that body, by which he had been suspended from the ministry. The case was clearly within the jurisdiction of the general conference, as the highest appellate judiciary of the Church; and there is no pretense for insisting that in this judgment that respectable body of ministers were governed by any corrupt or improper motives. If they erred in their conclusions upon the law or facts of the case, no other presumption is allowable than that it was an error of judgment; a species of error, it may be remarked, to which all human tribunals are liable, and of no uncommon occurrence.

The case of Bishop Andrew involved the exercise of the legislative power of the general conference. That body adopted a resolution, by a large majority, expressive of its opinion, that under the circumstances of the case, it was expedient that the bishop should cease to exercise the duties of his office, till relieved from the impediment which, in its judgment, his connection with slavery had created. This, it will be noticed, was not a judicial sentence, but a mere legislative declaration of the sense of the conference on a question of expediency, and subject to rescission by any succeeding conference. There is nothing, either in the preamble or resolution, imputing crime or immorality to the bishop, or in any way impeaching his standing or character as a Christian, except in the estimation of those who hold that the ownership or holding of slaves, under any conceivable circumstances, involves moral turpitude. It appears, as well from the preamble to the resolution as the debates on the occasion, that the majority were not influenced so much by a conviction of the positive wrong of the bishop's conduct, as the apprehension that, in the position in which he had placed himself, he could not usefully and acceptably perform the duties of his high office. The principle of itinerancy, as applicable to ministers and bishops, lies at the foundation of the Methodist polity; and from the days of Wesley has been re-

garded as indispensable to the accomplishment of the great purpose for which the church was instituted. The bishops are required by the discipline to travel through the entire territorial limits of the Church. The preamble to the resolutions adopted in Bishop Andrew's case refers to this, and expresses the apprehension that his connection with slavery "will greatly embarrass the exercise of his office as an itinerant general superintendent, if not, in some places, entirely prevent it." There seems to have been nothing in the proceedings evincive of personal unkindness to the bishop, or a want of confidence in his piety as a Christian minister. Nor can the resolution first adopted be fairly construed as importing a sentence of deposition against him. If there was room for a doubt as to the intention of the general conference in this respect, it is removed by the explanatory resolutions subsequently passed, declaring that he was still to be regarded as a bishop, with the full right, at his own option, to continue in the discharge of his usual official duties.

In this country there is no connection between church and state. As the result of this happy disseverance, it is the right of all men freely to choose such church association as they prefer; and when within the pale of a church organization, they can adopt such rules of discipline and government as may best suit their own views, subject to this limitation, that they are not in violation of the national or state laws. The civil government claims no right, and clearly possesses none, to interfere with or supervise the doings of any ecclesiastical body, except as they may be involved in a judicial case, in which rights of property are drawn in question. And it is only in this view that this court can take cognizance of, or adjudicate on, the matter now under consideration. There can be no doubt that an ecclesiastical judiciary may so clearly and palpably overleap its just constitutional limits, and so grossly infringe the rights of an individual or a minority, as to render it expedient and necessary that they should withdraw from its jurisdiction. And when such withdrawal is unavoidable, from the pressure of necessity, it would be unjust that those who are driven to this course, should be deprived of any of the rights of property to which they were entitled before secession. But to save such rights, seceders will be required to make out a clear case of necessity. And upon such an issue, involving the actions of a body of men who may well be supposed to be governed by the promptings of a pure benevolence, and to have adopted the teachings of the word of God as their rule of action, no unfavorable presumption as to motive can be entertained.

It is not proposed, in entering on the inquiry, whether the action of the general conference brings the withdrawing conferences of the South and South-West within the prin-

-ciple before stated, to review minutely the facts, which, it is alleged, left them no oth-er course but separation from the Methodist Episcopal Church. Prior to the year 1844, there had been some abolition movements in portions of the North, which were probably indiscreet and uncalled for. In 1842, a large body of Northern Methodists seceded, on the ground that the Methodist Episcopal Church was too lax in its discipline in regard to the ownership of slaves by ministers and members. It was not, however, till the meeting of the general conference of 1844, that any thing occurred, affording a specific ground of complaint to the South, and which threat-ened seriously to disturb the harmony so long existing between it and the North. In their public acts and declarations, the South-ern members specify, as their grounds of complaint, the proceedings of the general conference in the cases of Harding and Bishop Andrew. It was not claimed that there had been any previous action of that high judi-catory indicating a purpose of infringing or trampling upon the rights of the Southern portion of the Church, or foreshadowing the necessity of severance. The inquiry, then, may be narrowed down to this, namely: Did the action of the general conference, in the two cases noticed, afford such a necessity for secession as will save to those who leave, their previously-existing interest in and claim to, the charities or property pertaining to the Church? In deciding this point, the court, as before intimated, is not aware of the necessity of a critical examination of the law and the facts in the cases passed upon by the general conference, with a view to determine whether the proceedings were erroneous or otherwise; for it seems to the court quite immaterial whether, in the one case, that body erred in affirming the judgment of suspension against Mr. Harding entered in the lower court, or, whether, in Bishop Andrew's case, they improperly ex-ercised their legislative power. Suppose they were wrong in both cases: was a crisis pro-duced, calling for and requiring immediate measures for a secession on the basis of ne-cessity? It is very far from the purpose of the court, to impeach the motives, or in any way to censure the eminent and pious men of the South who thought it to be their duty to encourage the measure of withdrawal. It is not intended to affirm or insinuate that they may not have had a deep-seated and earnest conviction of the truths they so elo-quently and impressively made known to the world, as to the cause of the movement. There is no reason to doubt that they sin-cerely believed the best interests of religion demanded it; and they may stand acquitted of any wrong before him who is the Searcher of hearts. But this still does not make out the case of an involuntary or compulsory secession, in the sense already stated; nor does it establish the position that their rights had been willfully outraged and the constitution so palpably violated as to make it a necessity that the South should secede. It may have afforded, in their judgment, a fitting occasion for the exercise of their unquestioned right to withdraw from the Church at their pleasure; but it does not prove that the withdrawal took place under circumstances that justify the conclusion that they are out of the Church by an unavoidable necessity, caused by the wrong action of the general conference. This position must be made out, in order to place these complainants on the footing which they claim rightfully to occupy in this case. For this court is unwilling to give its sanction to the principle, that an error of judgment—if it be assumed that the general conference has erred—in a case where it had jurisdiction, and in the absence of any semblance of corrupt or improper motive, whether in the exercise of its judicial or legislative power, affords a just cause, a legal necessity, for se-cession by those supposing themselves to be aggrieved. I do not propose to attempt the discussion of the principle here involved; though it might be profitable, under other circumstances, to examine it. It is enough to say, that the practical recognition of the right of secession or revolution, on such a ground, whether applied to civil or ecclesiastical governments, must inevitably lead to a condition of anarchy, fatal to the existence of every thing like order and stability. Its baneful tendencies are too obvious to need illustration.

As the result of the views I have attempted to present, it follows:

1. That the general conference of the Methodist Episcopal Church is a delegated or representative body, with limited constitutional powers; and possesses no authority, directly or indirectly, to divide the Church.

2. That in the adoption of the "Plan of Separation" in 1844, there was no claim to, or exercise of, such a power.

3. That as the general conference is prohibited from any application of the produce of the Book Concern, except for a specified purpose, and in a specified manner; and as the annual conferences have refused to remove this prohibition, by changing or modifying the sixth restrictive rule, the general conference has no power to apportion or divide the Concern or its produce, except as provided for by said rule.

4. That said Book Concern is a charity, devoted expressly to the use and benefit of the traveling, supernumerary, and superannuated preachers of the Methodist Episcopal Church, their wives, widows, and children, continuing in it as an organized church; and, any individual, or any number of individuals, withdrawing from, and ceasing to be members of the Church, as an organized body, cease to be beneficiaries of the charity.

5. That it is the undoubted right of any individual preacher or member of said Church, or any number of preachers, or

members; or any sectional portions or divisions thereof, to withdraw from it, at pleasure; but in withdrawing, they take with them none of the rights of property pertaining to them, while in the Church; and, that the withdrawal of the Southern and Southwestern conferences in 1845, being voluntary, and not induced by any positive necessity, is within the principle here stated.

6. That the defendants, as trustees or agents of the Book Concern, at Cincinnati, being corporators under a law of Ohio, and required, by such law, "to conduct the business of the Book Concern in conformity with the rules and regulations of the general conference," in withholding from the Church South, any part of the property or proceeds of said Book Concern, have been guilty of no breach of trust, or any improper use or application of the property or funds in their keeping.

7. That this is not a case of lapsed charity, justifying a court of equity in constructing a new scheme for its application and administration; and that the complainants, and those they represent, have no such personal claim to, or interest in, the property and funds in controversy, as will authorize a decree in their favor, on the basis of individual right.

There are some points made by counsel, which, not being regarded as material in the decision of the case, have not been specially noticed.

It now only remains for me to say, that it was with some reluctance and self distrust, that I entered upon the investigation of this controversy; and, although the conclusions to which I have arrived, have been satisfactory to myself, I experience the highest gratification from the reflection, that if I have misconceived the points arising in the case, and have been led to wrong results, my errors will be corrected by that high tribunal, to which the rights of these parties will, without doubt, be submitted for final adjudication.

The decree dismissing the bill was reversed on an appeal to the supreme court, December term, 1853 [16 How. (57 U. S.) 288].